IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       Plaintiff,

       -v-

THE PREMISES AND REAL PROPERTY WITH
BUILDINGS, APPURTENANCES, AND
IMPROVEMENTS AT 201 GANSON STREET,
THAT IS, ALL THAT TRACT OR PARCEL OF LAND,
SITUATE IN THE CITY OF BUFFALO, COUNTY OF
ERIE, AND STATE OF NEW YORK, AND MORE
PARTICULARLY DESCRIBED IN A CERTAIN
DEED RECORDED IN THE ERIE COUNTY
CLERK'S OFFICE IN LIBER 11272 OF
DEEDS AT PAGE 3573,

       Defendant.

---

## VERIFIED COMPLAINT FOR FORFEITURE

The United States of America, by its attorney, William J. Hochul, Jr., Assistant

United States Attorney for the Western District of New York, Richard D. Kaufman,

Assistant United States Attorney, of counsel, for its Verified Complaint for Forfeiture herein

alleges as follows:

### CAUSE OF ACTION

1.    This is an action in rem for the forfeiture of the portion of the premises,

buildings, appurtenances, improvements and real property located at 201 GANSON Street,

Buffalo, New York, (hereinafter referred to as the "defendant property"), and more

particularly described in Schedule "A" attached hereto. The defendant property is located

within the Western District of New York and subject to forfeiture pursuant to the provisions

of 18 U.S.C. § 981 (a)(1)(C) as a portion of the defendant property is or constitutes the proceeds of or traceable to violations of mail fraud (18 U.S.C. § 1341), and/or wire fraud (18 U.S.C. 1343) and involved in, or traceable to property involved in, Money Laundering, a violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1957(a).

2.     This Court has subject matter jurisdiction of this action pursuant to the provisions of 28 U.S.C. §§ 1345 and 1355(a), and in rem jurisdiction pursuant to 28 U.S.C. §§ 1355(b) and 1355(d).  Venue is properly premised in the Western District of New York pursuant to 28 U.S.C. § 1395.

3.     The defendant property is advertised as having five buildings with approximately 54,544 square feet of space titled to Buffalo Creek Property Group LLC, a limited liability corporation whose sole member is DAVID PFEIFFER.

## BACKGROUND

4.     This investigation was initiated in 2011 due to irregularities found within federal contracts pertaining to Disadvantaged Business Enterprises ("DBE") in public works contracts.   United State Department of Transportation (DOT) funded government contracts contain a requirement that the prime contractor use DBE subcontractors for a specified portion of the public-works contract, usually expressed as a percentage of the total contract price.   The DOT's office of the Office of Inspector General (OIG) has determined, through numerous investigations throughout the United States, that the DBE program is subject to widespread fraud and abuse by general contractors and subcontractors who submit false and

fraudulent documentation to the public contracting agencies in support of purported DBE participation in both the pre- and post-award phases.

5.     As set forth in further detail below, law enforcement agents and investigators have uncovered substantial evidence demonstrating that SUE-PERIOR CONCRETE and PAVING INC. (hereinafter "SUE-PERIOR"), SUE-PERIOR's nominee owner, MAN O' TREES INC. (hereinafter "MOT"), and DAVID PFEIFFER, devised a scheme to defraud and mislead public contracting agencies, enabled a general contractor, MOT, to receive DBE credit when not entitled, and engaged in a scheme to defraud for their own financial gain. The scheme to defraud involved SUE-PERIOR serving as a front or a pass-through for MOT, that is, SUE-PERIOR became a certified DBE, and sub-contractor to MOT, solely to obtain DBE credit for MOT on federally funded government projects. In reality, SUE-PERIOR served no commercially useful function.

## THE DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

6.     The following paragraphs summarize Title 49 Code of Federal Regulations Part 26 (49 C.F.R § 26), Participation by Disadvantage Business Enterprises in Department of Transportation Financial Assistance Programs.   In or about 1980, the US DOT issued regulations in connection with a program to increase the participation of minority and disadvantaged business enterprises ("DBEs") in federally-funded public construction contracts (the "DBE Program").   Recipients of USDOT construction grants were required to establish a DBE program, pursuant to which they would set specific goals for the percentage of work to be awarded to DBEs and ensure that good faith efforts were made by general contractors to employ qualified DBE subcontractors.

3

7.     The New York State Department of Transportation ("NYS DOT") is a recipient of DOT construction grants and has established a DBE program.

8.     To qualify as a DBE, a company must be certified in the state within which it seeks to perform work.  A company seeking to be qualified as a DBE in the State of New York must file an application with one of the following entities: (1) the NYS DOT; (2) the Niagara Frontier Transit Authority/Equal Employment Opportunity/Diversity Development Department; (3) the Port Authority of New York New Jersey; or (4) the Metropolitan Transportation Authority.[1]  Once a company is certified as a DBE, it is also required to periodically submit a recertification application to maintain its DBE status.[2]

9.     To be certified as a DBE, a company must be owned and controlled by socially and economically disadvantaged individuals ("SEDs"), who must own at least 51% of the company.  Moreover, the SED's ownership of the firm "must be real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents."[3]  The SED must also "possess the power to direct or cause the direction of the management and policies of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations."[4]

---

[1] Previously, a DBE was required to obtain certification from each entity for which it was seeking to perform work as a DBE.   A DBE need only obtain certification from one of these entities, and that certification will be recognized by the other entities.

[2] 49 C.F.R § 26.81

[3] 49 C.F.R. § 26.69 (c).

[4] 49 C.F.R. § 26.71 (d).

10.     In addition, to qualify as a certified DBE, the company must be an independent business.   Among other things, this means that the DBE must employ its own work force. Accordingly, the DBE's employees may not be associated with non-DBE firms to the extent that those associations compromise the DBE's independence.   The DBE must also own equipment necessary to perform its work and must be able to meet its financial obligations on its own.[5]

11.     A contractor receiving federal funds must make a good faith effort to use certified DBEs as subcontractors for a specified percentage of the total contract value.   That specified percentage is commonly referred to as the "DBE goal."[6]   Contractors may only count toward their DBE goal those payments made to DBEs that perform a "commercially useful" function.   Federal regulations provide guidance as to what constitutes a commercially useful function.   In particular, a DBE subcontractor performs a commercially useful function:

> when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To perform a commercially useful function, the DBE must also be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself. To determine whether a DBE is performing a commercially useful function, you must evaluate the amount of work subcontracted, industry practices, whether the amount the firm is to be paid under the contract is commensurate with the work it is actually performing and the DBE credit claimed for its performance of the work, and other relevant factors.[7]

---

[5] 49 C.F.R. § 26.71 (b)(1-4)

[6] Although federal regulations provide for a DBE goal of 10%, a government entity may set its own DBE goal for a particular contract.

[7] 49 C.F.R. § 26.55(c)(1).

On the other hand, a DBE subcontractor does <u>not</u> perform a commercially useful function:

> if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation.[8]

12.     The NYS-DOT adopted DBE provisions in its Standard Specifications, §102-22, DBE Utilization ("NYS-DOT Standard Specifications") applicable to its Federal-Aid construction projects.

13.     Adherence by prospective general contractor-bidders to the stipulated requirements for DBEs is a critical element for contract bidding and contract award.   Failure to provide a DBE utilization plan to meet the established DBE goal for the contract may be grounds for rejection of the bid as being non-responsive.

14.     Applicable federal regulations, specifically 49 CFR Sec. 26.71(b), provide that only independent businesses may be certified as a DBE, to wit:

> "An independent business is one the viability of which does not depend on its relationship with another firm or firms.   In determining whether a potential DBE is an independent business, you must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, financial . . . and other resources."

15.     In New York State, in order to be qualified as a DBE, the business entity, among other things, must submit a written application to one of the NYS agencies identified in paragraph 8 and become certified.

---

[8] 49 C.F.R. §   26.55(c)(2).

**RELEVANT BUSINESS ENTITIES**

A.   **SUE-PERIOR CONCRETE AND PAVING, INC.**

16.    SUE-PERIOR's nominee owner is the President and majority owner of SUE-PERIOR, purportedly in the business of general/sub-contracting, concrete, paving and installation of water and sewer lines.   According to the New York State Department of State ("NYS-DOS"), SUE-PERIOR was incorporated in the State of New York on October 27, 2003.   SUE-PERIOR presently exists on "paper" only and is no longer in operation. According to a witness in the investigation, SUE-PERIOR was named after PFEIFFER's girlfriend.    The 201 GANSON Street address was used for SUE-PERIOR from approximately August 2011 through August 2012.


17.    On or about May 21, 2009, a DBE Certification Application, containing the signature of SUE-PERIOR's nominee owner, was submitted to the NFTA for SUE-PERIOR.    The DBE Certification Application containing the signature of SUE-PERIOR's nominee owner was false and fraudulent as to material information contained in the application.    SUE-PERIOR's nominee owner listed the address of SUE-PERIOR as 1500 Union Road, Suite 201, West Seneca, New York 14224.   In the DBE Certification Application, SUE-PERIOR's nominee owner answered "No" to the question, "Is your firm co-located at any of its business locations, or does it share a telephone number, P.O. Box, office space, yard, warehouse, facilities, equipment, or office staff with any other business, organization, or entity?"   This application also disclosed in Sections 3 and 4, the following:

7

[3]     Ownership:   Identify all individuals or holding companies with any ownership interest in your firm.

SUE-PERIOR's nominee owner, President, listed his percentage ownership for SUE-PERIOR at 66 and two thirds ownership.   SUE-PERIOR's nominee owner circled "NO" to the application question does this owner own or work for any other firm(s) that has a relationship with this firm.[9]

Additional Ownership information was provided as part of the NFTA DBE application.

DAVID PFEIFFER is listed as the Director of SUE-PERIOR.   PFEIFFER's ownership interest was listed as 33 and one third percent of SUE-PERIOR. The answer "NO" was circled on the application next to the question, does this owner own or work for any other firm(s) that has a relationship with this firm.

[4] Control: Identify your firm's Officers and Board of Directors.

SUE-PERIOR's nominee owner identified himself as an Officer of the Company listed as the President.   Another Officer of the Company was identified and is listed as the Secretary and Treasurer.   Date of appointment for both Officers is October 27, 2003.   On March 11, 2008, SUE-PERIOR's nominee owner identified himself and DAVID PFEIFFER as members of the Board of Directors.

Application question under this subsection states, "Do any of the persons listed (1) and/or (2) above own or work for any other firm(s) that has a relationship with this firm?"

YES is circled and DAVID PFEIFFER is listed as the sole shareholder of MAN O' TREES INC.

Paragraph B Section 4 of the DBE application requests the applicant to identify the firm's management personnel who control the firm in the following areas:

Financial Decisions,
Estimating and bidding,
Negotiating and Contract Execution,
Hiring and Firing of management personnel, Field/Production Operations
Supervisor,
Office management,
Marketing/Sales,
Purchasing of major equipment,
Authorized to Sign Company Checks,
Authorized to make Financial Transactions.

---

[9] Question is listed as part of the ownership interest section B. of the DBE application.

SUE-PERIOR's nominee owner, as the President of SUE-PERIOR, is identified as the person in control of all of the areas listed, with the exception of estimating and bidding.   SUE-PERIOR's nominee owner failed to disclose that DAVID PFEIFFER had any role in any of these functions at SUE-PERIOR, even though there was space to list additional persons with these responsibilities.

18.   Therefore, it was clear from the application that SUE-PERIOR's nominee owner held himself out as being the President, majority shareholder, and the individual with decision making control of SUE-PERIOR as the applicant for DBE certification.   According to the NFTA Office of Equal Opportunity and Diversity Development[10] records, on July 2, 2009, SUE-PERIOR was approved by NFTA as a DBE contractor for concrete and paving services, among other services, based upon information submitted by SUE-PERIOR's nominee owner and SUE-PERIOR pursuant to the DBE Certification Application dated May 21, 2009.

19.   On July 20, 2010, the NFTA EEO/Diversity Development re-certified SUE-PERIOR as a DBE, based on an affidavit indicating no changes had been made to the ownership and responsibility structure of SUE-PERIOR which had been submitted by SUE-PERIOR to NFTA.   This re-certification was valid from 2010 to 2012.

20.   On March 29, 2012, the NFTA EEO/Diversity Development sent a letter to SUE-PERIOR's nominee owner addressed to 201 GANSON Street, Buffalo, New York, re-certifying SUE-PERIOR as a DBE, based on an affidavit indicating no changes had been made to the ownership and responsibility structure of SUE-PERIOR which had been submitted by SUE-PERIOR to NFTA.

---

[10] The NFTA EEO/Diversity Development is the NFTA component which is responsible for, among other things, evaluating business entity applications for DBE certification.

9

21.    SUE-PERIOR CONCRETE and PAVING INC. conducted business through 2012 from two known locations: (1) 201 GANSON Street, Buffalo, New York, 14203 and (2) 752 Wildwood Avenue, Salamanca, NY 14779, both locations situated in the Western District of New York.   Niagara Frontier Transit Authority and NYS-DOT records indicate that 201 GANSON Street, Buffalo, New York, 14203 was the address to which business correspondence and payments are sent via US mail.

22.    In October 2012, the United States Postal Service ("USPS") advised that 201 GANSON Street, Mailbox A and B, Buffalo, New York 14203 was associated with SUE-PERIOR CONCRETE and PAVING, SUE-PERIOR's nominee owner and DAVID PFEIFFER, and MAN O' TREES INC., for DAVID PFEIFFER, respectively.

23.    In April 2013, surveillance was conducted on 201 GANSON Street, Buffalo, New York, 14203.   It was observed that MAN O' TREES was identified by a white plaque located on the front of the building which read, "MAN O' TREES, 201 GANSON Street, Buffalo, NY 14203"; and an orange sign on the gate to the front of the building of 201 GANSON read in black letters, "MAN O' TREES, 201 GANSON Street, Buffalo, NY 14203".   It was also noted in April 2013 that there were two mailboxes, one marked "SUE-PERIOR" and one marked "MOT".

24.    On or about April 10, 2013, surveillance was conducted on 752 Wildwood Avenue, Salamanca, NY 14779.   It was observed that SUE-PERIOR was identified with 752 Wildwood Avenue: SUE-PERIOR CONCRETE was identified in black letters on a white board outside the location.   In March 2013, USPS advised that MOT and SUE-PERIOR

were both receiving mail at 752 Wildwood Avenue, Salamanca, New York 14779. According to the USPS, mail from 201 GANSON Street was being forwarded to 752 Wildwood at that time.

### B.    MAN O' TREES INC.

25.    DAVID PFEIFFER is the owner and sole shareholder of MOT, as well as one-third owner and Director of SUE-PERIOR.   MOT is a non-DBE company, purportedly in the business of general/sub-contracting, according to the MOT website at www.manotrees.com, MOT was a private company categorized under general contracting and site development contractors, working on highways, roads and sidewalks for municipal, commercial and residential projects.   According to the NYS-DOS, MOT was incorporated in the State of New York on July 27, 1998. Presently MOT exists on "paper" but is not in operation.   The NYS-DOS indicates that DAVID C. PFEIFFER is identified as the chairman and chief executive officer and the registered agent for MOT.

### EVIDENCE THAT MAN O' TREES INC. AND SUE-PERIOR CONCRETE AND PAVING INC. WERE OPERATED AS ONE COMPANY AND CONTROLLED BY DAVID PFEIFFER

26.    Addresses were used interchangeably by MOT and SUE-PERIOR.   For example:

- Monthly bank statements for both MOT and SUE-PERIOR were being sent to 1500 Union Road, West Seneca, New York until August 2011, then to 201 GANSON Street, Buffalo, New York from August 2011 to July 2012, and then to 752 Wildwood Avenue, Salamanca, New York, where they are presently being received.   Each time, both companies changed their addresses at the same time;

- In a "New York State Vendor Responsibility Questionnaire for Profit Construction", DAVID PFEIFFER lists the business address for MOT as 1500 Union Road, Suite 201, the same address utilized by SUE-PERIOR at that time;

- In the fall of 2011, both MOT and SUE-PERIOR moved their offices to 201 GANSON Street, Buffalo, New York. MOT utilized Mailbox A and SUE-PERIOR utilized Mailbox B at this same street address;

- Oftentimes, customers made checks payable to MOT or SUE-PERIOR at 201 GANSON Street, Buffalo, New York and 752 Wildwood Avenue, Salamanca, New York;

- Vehicle registration and insurance documents for SUE-PERIOR vehicles utilized the addresses of 1500 Union Road, Suite 201 and 752 Wildwood Avenue, Salamanca;

- DAVID PFEIFFER signed a lease agreement on behalf of SUE-PERIOR for equipment to be utilized at 752 Wildwood Avenue;

- SUE-PERIOR utilized 1500 Union Road, Suite 201, 752 Wildwood Avenue, and 201 GANSON Street, Box B for addresses for income tax filings;

- Correspondence related to a SUE-PERIOR insurance policy was addressed to SUE-PERIOR at 1500 Union Road, Suite 201 and began "Dear David";

- SUE-PERIOR utilized 201 GANSON Street, Mailbox B and 752 Wildwood Avenue while working on the 10th Street project in Niagara Falls;

- Man O' Trees used the address 1500 Union Road, Suite 201 in bid documents submitted for the Route 104 project in Niagara Falls. Checks for this project were sent to MOT at 201 GANSON Street, Mailbox A. SUE-PERIOR utilized 752 Wildwood Avenue on their certified payrolls for their work on the Route 104 project.

27.    MOT, DAVID PFEIFFER, and SUE-PERIOR were financially intertwined;

for example:

- DAVID PFEIFFER signed almost all payroll checks written from the SUE-PERIOR payroll bank account through at least September 2012;

- DAVID PFEIFFER, along with SUE-PERIOR's nominee owner, signed almost all of the checks from the SUE-PERIOR operating bank account through at least the end of 2012. These checks required two signatures and PFEIFFER's name is pre-printed on the checks above the first line. SUE-PERIOR's nominee owner's name is not pre-printed on these checks;

- Through at least the end of 2012, SUE-PERIOR was a Guarantor on six different Commercial Term Loans taken out by MOT. In fact, PFEIFFER signed as guarantor on behalf of SUE-PERIOR;

· DAVID PFEIFFER signed for a Certificate of Deposit and a Commercial Line of Credit, both in the name of SUE-PERIOR. Also, through the end of 2012, MOT was a Guarantor on the SUE-PERIOR Commercial Line of Credit at Five Star Bank;

· In September 2009, checks payable to SUE-PERIOR in the amounts of $141,745.39, $24,078.11, and $2,792.43 were deposited to an MOT bank account at Five Star Bank;

· Analysis of Five Star Bank account records revealed that MOT wrote checks to or on behalf of SUE-PERIOR that totaled $822,900.00 during the period May to October 2011 that indicated "loan" or "advance" in the memo section of the check;

· During mid to late 2012, MOT funded almost the entire SUE-PERIOR payroll account totaling approximately $220,000.

28.    Additional information indicating that DAVID PFEIFFER controls both MOT and SUE-PERIOR includes:

On two personal bank accounts opened by SUE-PERIOR's nominee owner during 2007 and 2010, SUE-PERIOR's nominee owner listed his employer as "Mann O Trees" on the signature cards;

MOT and SUE-PERIOR shared many management and other office employees. These common employees signed documents, including certified payrolls and monthly employment reports, in various capacities on behalf of both MOT and SUE-PERIOR while collecting their paycheck from one or both companies during the same time period.  Also, one of the employees has signatory authority over both the MOT and SUE-PERIOR payroll bank accounts.  Furthermore, Project Managers and other management employees worked for both companies while collecting paychecks from both companies during the same time period;

Many other hourly employees were listed on the certified payrolls as employed by both MOT and SUE-PERIOR during the same work week, and, on occasion, even the same work day;

In January 2011, a Notice of Claim was filed with the Erie County Clerk's office on behalf of SUE-PERIOR which was sworn and signed by David C. PFEIFFER, Director, SUE-PERIOR Concrete & Paving Inc.  In the Notice of Claim, PFEIFFER states, "SUE/PERIOR and its affiliate (emphasis added) Man O' Trees Inc. ...";

Analysis of bank and payroll records revealed that, during 2011, SUE-PERIOR's nominee owner began receiving payroll checks from MOT.  Later in 2012,

SUE-PERIOR's nominee owner did not receive a weekly paycheck from SUE-PERIOR and was receiving a weekly paycheck solely from MOT.   Review of certified payrolls filed by MOT during 2012 list SUE-PERIOR's nominee owner as an employee of MOT.

Records of MOT and SUE-PERIOR were found comingled during search warrants executed at 201 GANSON Street and 752 Wildwood Avenue.

Review of payroll records secured during these search warrants revealed that employees were paid by both MOT and SUE-PERIOR for hours worked during the same workday.   For example, several employees regularly split their workday for payroll purposes between MOT and SUE-PERIOR and were paid for 4 hours each day by each company.

Witnesses interviewed as part of the investigation disclosed that PFEIFFER had ultimate decision making authority over all matters involving both MOT and SUE-PERIOR, including financial decisions.

## SUMMARY OF SCHEME TO DEFRAUD

29.     Based upon the information set forth below PFEIFFER and SUE-PERIOR's nominee owner entered into a scheme to defraud government agencies by providing false information and documentation to obtain DBE status. SUE-PERIOR was merely acting as a pass-through DBE and had no commercially useful function.   This allowed PFEIFFER and his non-DBE company, MOT, to bid and obtain government contracts that he would otherwise not be eligible for if he did not utilize a DBE.   It is believed that PFEIFFER and SUE-PERIOR's nominee owner conspired to enter into this scheme to take credit for DBE participation on federally funded contracts, by having the non-DBE contractor perform all the work on behalf of the DBE.   Additionally, SUE-PERIOR's nominee owner, as the DBE, was not in control of SUE-PERIOR, when, in fact, it was the non-DBE PFEIFFER who controlled all aspects of the DBE's company.

**THE CONTRACTS**

**A.     RECONSTRUCTION OF NYS ROUTE 104**

Contract for NYS Route 104:

30.     ·On or about June 2009, MOT was announced as the low-bidder on a City of Niagara Falls reconstruction project for NYS Route 104, aka Main Street and Lewiston Road, from Bath Avenue to the Niagara Falls North City Line Contract No. RP#169, P.I.N. 5045.24, (hereinafter the "ROUTE 104 PROJECT"), located in the Western District of New York, with said contract, valued at $7,713,000, being awarded to MOT, as the general contractor.   According to contract documents this project was 80% federally funded through reimbursement from the Federal Highway Administration (FHWA) to the City of Niagara Falls as a local project with oversight of the funding administered by NYS DOT.

31.     DAVID PFEIFFER, at all times relevant, was familiar with federal DBE contract requirements.   On June 18, 2009, DAVID PFEIFFER, signed said NYS Route 104 contract as President of MOT.   The NYS Route 104 contract was subject to the federal DBE provisions with an established DBE goal of 11% of the total contract value.   In addition, included in the bid package for the NYS Route 104 contract was a DBE Utilization form. PFEIFFER'S name was affixed to the DBE Utilization form and his initials appeared next to his name.   PFEIFFER designated himself according to the DBE Utilization form as the Disadvantage Business Enterprise Officer.   According to the DBE Utilization form, PFEIFFER designated himself as the person responsible for effectively administering and promoting an active Disadvantaged Business Enterprise Program.

32.   ·On June 9, 2010, a 'D/M/WBE Utilization Worksheet', for the ROUTE 104 PROJECT identified SUE-PERIOR as a DBE "Subcontractor".   The D/M/WBE Utilization Worksheet provided that SUE-PERIOR was to be paid approximately $900,000 for the construction services and items described within the Utilization Worksheet, and that 100% of this expenditure would count towards the established DBE goal.

A.   <u>Investigative Findings for Route 104</u>: The investigation has reviewed FHWA, NYS DOT and local City of Niagara Falls computer records as well as hard copy files and observed that:

- Many of the employees listed on SUE-PERIOR certified payrolls were also listed on MOT's certified payrolls;

- The Engineer in Charge for the construction management firm that was overseeing operations at the Route 104 project observed MOT paving equipment being used by individuals that were reported as employees of SUE-PERIOR;

- In June 2009, bid documents submitted for the Route 104 project reflected MOT address as 1500 Union Road, Suite 201, the same address used by SUE-PERIOR;

- In 2010, the individual who certified payrolls as "Book keeper" for MOT also completed the certified payrolls as "Book keeper" for SUE-PERIOR;

- In April 2010, the same two individuals signed in at job progress meetings for the Route 104 job as representatives of MOT and SUE-PERIOR.

- The DBE compliance officer for SUE-PERIOR at the 10th Street project; was also listed as the superintendent of the ROUTE 104 project for MOT at the same time;

- MOT submitted cellular telephone bills for reimbursement at the Route 104 project. The bills reflected that the account was #980175535-00001, the same account number for the cellular telephone bills submitted by SUE-PERIOR at the 10th Street job, indicating that the cellular telephones used by MOT and SUE-PERIOR employees were subscribed under one and the same account.

16

### B.   UNION SHIP CANAL PROJECT

33.   On or about December 8, 2009, the Erie County Industrial Development Agency and the Buffalo Urban Development Corp. let a contract (Contract No. 2009-1) under NYS DOT Pin No. 5757.98 for construction adjacent to the Union Ship Canal ("hereinafter the Open Space Project"). The Open Space Project contract was valued at approximately $6,486,000. The contract for the Open Space Project was awarded to MOT. According to the contract, this project was funded in part through FHWA as part of a federal aid project. The contract was subject to the federal DBE provisions with an established DBE goal of 9% of the total contract value.

·   On December 24, 2009, MOT submitted a D/M/WBE Schedule of Utilization AAP-19C, representing that SUE-PERIOR was the DBE sub-contractor to perform sub-contract construction valued at approximately $584,000.

·   On December 24, 2009, a D/M/WBE Utilization Worksheet identified SUE-PERIOR as a DBE Subcontractor. The D/M/WBE Utilization Worksheet provide that SUE-PERIOR was to be paid $584,000 for the construction services and items described within the Utilization Worksheet, and that 100% of this expenditure would count towards the established DBE goal.

B. Investigative Findings: Your deponent and other agents/investigators have reviewed FHWA, NYS DOT and local computer records as well as hard copy files and observed that:

- NYS DOT Employment Utilization Report for MOT submitted for payment had a fax header for "SUEPERIOR" and was signed by the Office Clerk;

- Certified payrolls submitted as part of a payment requisition for MOT had a fax header for "SUEPERIOR" and was received from SUE-PERIOR's fax number, "716-677-5277";

- Certified payroll was signed by the bookkeeper for MOT.

### C.   GALLAGHER PAVILIONS AND TIMES BEACH BOARDWALK PROJECT

34.    On or about March 1, 2010, NYS-DOT entered into a contract (NYS-DOT No. D261362) with MOT for the improvement of the Gallagher Beach Pavilions and Times Beach Boardwalk, (hereinafter the "Gallagher and Times Beach Project"), located in the Western District of New York.    The initial contract was valued at $1,403,000.00, but changes in the contract resulted in a final figure of $1,412,404.40.    According to the contract, the Gallagher and Times Beach Project received 100% federal funding as granted through FHWA pursuant to the American Recovery & Reinvestment Act of 2009, ("ARRA").    The contract required that certain information be entered into a computer system operated by NYS DOT called the Equitable Business Opportunities ("EBO") system.    The EBO system, which is required on all NYS DOT construction contracts, mandates contractors enter workers' hour and wage information on a weekly basis.    According to NYS DOT, each contractor is provided with a separate logon and password to enter into the EBO system.    As such, when payment is made to the general contractor, which includes payments for its sub- contractors, an acknowledgment must be provided to NYS DOT by the sub-contractor to verify payment was received.    In addition, the contract was subject to the federal DBE provisions with an established DBE goal of 9% of the total contract value.

35.    On March 5, 2010, a NYS-DOT 'D/M/WBE Utilization Worksheet', for the Gallagher Pavilions and Times Beach Boardwalk Project identified SUE-PERIOR as a DBE "Subcontractor."    The D/M/WBE Utilization Worksheet provided that SUE-PERIOR was to be paid $128,686.79 for the construction services and items described within the Utilization Worksheet, and that 100% of this expenditure would count towards the

established DBE goal.  The worksheet was submitted to NYS DOT for review and was approved on March 10, 2010.

A. <u>Investigative Findings</u>: Agents/investigators have reviewed NYS DOT computer records through the EBO system as well as hard copy files and observed that:

- The March 2010 DBE utilization agreement signed by representatives of both SUE-PERIOR and MOT disclosed that both companies listed their business location as 1500 Union Road, Suite 201.  MOT identified the city of Buffalo as the location of its business location, and SUE-PERIOR identified the Town of West Seneca as the location of its offices even though each business was located in the same building.

- SUE-PERIOR's nominee owner was listed as a MOT employee, working 104 hours during the period January 29, 2012 through March 18, 2012 and receiving wages as a journeyman worker earning $27.11 per hour from MOT as itemized on the NYS DOT payment system;

- Certified payrolls electronically submitted to NYS DOT during this project revealed that many employees were listed on MOT's certified payroll one week and then transferred to the DBE, SUE-PERIOR payroll the following week or even switched mid-week.  The supervisor listed on MOT's payroll for one week was transferred to SUE-PERIOR the following pay period.  Additionally, the MOT/SUE-PERIOR supervisor received a paycheck from the SUE-PERIOR payroll account for work during that pay period;

- Employees were paid by both MOT and SUE-PERIOR for work performed during the same work week.  The EBO report disclosed that an employee received a paycheck for work performed for both MOT and SUE-PERIOR for the same work week.  Also, the EBO report disclosed that the same employee had two common work days for MOT and SUE-PERIOR on August 1, 2011 and September 4, 2011.  The EBO report indicated that this same employee received 32 hours straight time from MOT and 32 hours straight time from SUE-PERIOR;

- A second employee was listed as the NYS DOT affirmative action representative and the SUE-PERIOR DBE compliance officer on the project as well as a management employee.  He received paychecks from both MOT and SUE-PERIOR during the same work week.

## FINANCIAL ANALYSIS

36.    A Department of Labor Special Agent analyzed certain bank records and found deposits traceable from the contracts listed above which were obtained based on the

DBE certification presented by SUE-PERIOR, but in fact were under the oversight of MOT.

The deposits were received into MOT's Operating Account ending in 4954 at Five Star Bank

between August 18, 2011 – July 2, 2012 as shown below:

| DATE | AMOUNT | ASSOCIATED CONTRACT |
|---|---|---|
| 8/11/11 | 344,672.12 | UNION SHIP |
| 8/18/11 | 47,764.13 | GALLAGHER |
| 8/22/11 | 110,000.00 | UNION SHIP |
| 8/22/11 | 49,618.05 | UNION SHIP |
| 9/8/2011 | 381,912.81 | RT. 104 |
| 9/12/11 | 83,014.56 | UNION SHIP |
| 9/12/11 | 36,675.49 | UNION SHIP |
| 9/26/11 | 433,956.90 | UNION SHIP |
| 9/29/11 | 80,570.51 | GALLAGHER |
| 10/5/11 | 192,283.47 | UNION SHIP |
| 10/12/11 | 373,691.15 | RT. 104 |
| 10/24/11 | 130,587.49 | GALLAGHER |
| 11/2/11 | 443,695.13 | RT. 104 |
| 11/10/11 | 206,001.36 | UNION SHIP |
| 11/29/11 | 347,083.33 | RT. 104 |
| 12/5/11 | 297,395.54 | GALLAGHER |
| 12/8/11 | 167,717.73 | UNION SHIP |
| 1/6/12 | 77,604.50 | GALLAGHER |
| 1/10/12 | 218,282.72 | RT. 104 |
| 2/1/12 | 24,403.10 | GALLAGHER |
| 2/7/12 | 109,839.31 | RT. 104 |
| 2/10/12 | 199,393.26 | UNION SHIP |
| 2/22/12 | 26,919.99 | GALLAGHER |
| 2/23/12 | 52,700.16 | UNION SHIP |
| 3/2/12 | 78,492.29 | UNION SHIP |
| 3/2/12 | 39,596.07 | UNION SHIP |
| 4/30/12 | 114,704.75 | UNION SHIP |
| 6/28/12 | 52,761.29 | GALLAGHER |
| 7/2/12 | 40,226.88 | GALLAGHER |
| **TOTAL** | **4,761,564.09** | |

**SUMMARY OF ABOVE:**

| CONTRACT | TIME-FRAME | TOTAL |
|---|---|---|
| UNION SHIP | 8/11/11 - 4/30/12 | $2,108,826.21 |

| GALLAGHER | 8/18/11 – 7/2/12 | $778,233.43 |
| RT. 104 | 9/8/2011 – 2/7/12 | $1,874,504.45 |

The proceeds received from each contract during this time period were sufficient to cover the corresponding tax obligations for 2011 – 2013 and mortgage payments on the GANSON Street property for August 2011- August 2012.   The totals received during this time period do not encompass all the payments made for each contract, but only a portion of the total.

37.     During the period from August 2011 through August 2012, when both MOT and SUE-PERIOR utilized 201 GANSON Street as their business address, monthly rent was payable to Buffalo Creek Property Group, the owner and mortgage holder of 201 GANSON Street.   As previously mentioned, Buffalo Creek Property Group is solely owned by DAVID PFEIFFER.   During this period, SUE-PERIOR paid no rent to any entity for use of space at 201 GANSON Street.   Also during this period, MOT transferred $12,895.10 almost on a monthly basis to the Buffalo Creek Property Group bank account ending in 5299 at Five Star Bank.   This was the same amount of the monthly mortgage payment due by Buffalo Creek on mortgage account ending in 7985 at Five Star Bank.   See chart below.

| DATE | MOT TO BUFFALO CREEK PROPERTY GROUP | BUFFALO CREEK PROPERTY GROUP TO FIVE STAR BANK |
|---|---|---|
| AUGUST 2011 | $12,895.10 | $12,895.10 |
| SEPTEMBER 2011 | 0 | $12,895.10 (UNKNOWN SOURCE) |
| OCTOBER 2011 | 0 | $12,895.10 (UNKNOWN SOURCE) |
| NOVEMBER 2011 | $12,895.10 | $12,895.10 |
| DECEMBER 2011 | $12,895.10 | $12,895.10 |
| JANUARY 2012 | $12,895.10 | $12,895.10 |
| FEBRUARY 2012 | $12,895.10 | $12,895.10 |
| MARCH 2012 | $12,895.10 | $12,895.10 |
| APRIL 2012 | $12,895.10 | $12,895.10 |

| | | |
|---|---|---|
| MAY 2012 | $12,895.10 | $12,895.10 |
| JUNE 2012 | $12,895.10 | $12,895.10 |
| JULY 2012 | $12,895.10 | $12,895.10 |
| AUGUST 2012 | $12,895.10 | $12,895.10 |
| **TOTAL** | **$153,452.10** | **$179,242.30** |

Analysis of the books and bank records of MOT and SUE-PERIOR revealed that SUE-PERIOR was not always paid for work allegedly performed as a sub-contractor for MOT. For example, SUE-PERIOR contracted with MOT to perform approximately $128,000 worth of work on the Gallagher Beach project. The records of SUE-PERIOR reflect that MOT did not pay SUE-PERIOR for their work at this project. Furthermore, New York State Department of Transportation (NYS-DOT) requires general contractors to certify that their sub-contractors have been paid as a condition for releasing payments from NYS-DOT to the general contractors on its projects. These records reflect that MOT certified that it paid SUE-PERIOR $84,485 on December 15, 2011 for the Gallagher Beach project, when, in fact, no payment actually occurred.

38.     PFEIFFER therefore engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) when he used proceeds derived from the fraudulent contracts to pay tax obligations on 201 GANSON Street as set forth below:

| | |
|---|---|
| 2011-2012 Erie County: | $1,987.17 (Payments made 6/20/11 – 2/27/12. |
| 2011-2012 City of Buffalo: | $12,373.04 (Payments made 10/4/11 – 2/17/12. |
| 2012-2013 City of Buffalo: | $12,691.92 (Payments made 5/29/13) |

   **TOTAL:        $27,052.13**

39.     The investigation establishes that the MOT account contains the "traceable proceeds" of the payments from fraudulently-obtained contracts and consequently any payments from that account consist, at least in part, those same proceeds. The comingling

of the fraudulent proceeds with monies from other sources does not prevent the forfeiture of those proceeds or real property traceable to those transactions[1].   This is the essence of money laundering.   So the government's theory may include that when fraud proceeds are deposited into accounts where monies obtained from other sources are deposited, a withdrawal from that account can be considered to consist of fraudulent proceeds.   This is known as the First In, First Out accounting method.   Or the government can assert that if fraudulent proceeds come in, intervening withdrawals will leave the fraudulent proceeds remaining.   This is known as the First In, Last Out accounting method.   To allow otherwise would encourage criminals to always commingle illegal funds with legitimate funds, because it would be virtually impossible for the government to ever trace the illegal source money dollar for dollar into subsequent transactions.

40.     The investigation to date determined that a sum of at least $180,504.23 was used to pay the taxes and mortgage in relation to 201 GANSON Street, thus increasing the equity value in the property.   As a result of such conduct, 201 GANSON Street is not only subject to forfeiture as property constituting or derived from specified unlawful proceeds, but became involved in the money laundering transactions as it benefitted from fraudulent proceeds.   201 GANSON Street also was involved in the money laundering offenses because it was the central location and a substantial base of operations for the MOT and SUE-PERIOR fraudulent schemes.

---

[1]   The only other substantial deposits into the MOT 5 Star account during this time period were other payments on contracts where MOT used SUE-PERIOR as either a DBE or MBE (Minority-owned Business Enterprise) on various New York State Contracts.   Thus although this investigation only focused on the federal contracts referred to specifically in this Complaint, it appears that all of MOT's deposits were tainted with fraud.

## CONCLUSION

41.   Based on the Department of Transportation records and their joint investigation with the Department of Labor, there is a preponderance of evidence to believe MOT used fraudulent means to obtain contracts with DBE components.   Without the DBE component, these contracts would not have been awarded to MOT/SUE-PERIOR.   The total amount paid on these contracts, $15,611,404, was therefore obtained through fraudulent means and used in part to pay for the 2011-2012 (inclusive) tax bills for 201 GANSON Street and the mortgage payments for 11 months (2011-2012) which was the property address used by SUE-PERIOR as well as MOT to facilitate the operation of PFEIFFER's fraudulent scheme to defraud.

42.   PFEIFFER therefore engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) when he used proceeds derived from the fraudulent contracts to pay tax bills and in violation of §1957(a) when those proceeds were used to make the mortgage payments for 201 GANSON.   Payments made for taxes and mortgage payments increases the equity of the property in that it prevents an encumbrance on the defendant property above and beyond the actual tax and mortgage amounts owed.   The monies used for the taxes and mortgage payments thereby increased PFEIFFER's interest and value in the defendant property.

### ENTITES/INDIVIDUALS
### THAT MAY HAVE AN INTEREST IN DEFENDANT PROPERTY

DAVID PFEIFFER          BUFFALO CREEK PROPERTY GROUP LLC

FIVE STAR BANK          CITY OF BUFFALO, Assessment and Tax Office

ERIE COUNTY, Real Property and Taxation     BUFFALO SEWER AUTHORITY

BUFFALO PUBLIC WORKS/USER FEE        BUFFALO WATER BOARD

CITY OF BUFFALO Inspections/Occupancy

CITY OF BUFFALO, Department of Law

**REQUEST FOR RELIEF**
**AND**
**REQUEST FOR WRIT OF ENTRY**

43.    In conclusion, and based upon the preponderance of the evidence, and the experience and training of the agents, law enforcement submits that the defendant property is subject to forfeiture pursuant to the provisions of 18 U.S.C. § 981 (a)(1)(C) as a portion of the defendant property (up to $180,504.23) is or constitutes the proceeds of or traceable to mail fraud (18 U.S.C. § 1341), and/or wire fraud (18 U.S.C. 1343) and involved in, or traceable to property involved in violations of Money Laundering, 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957(a).

44.    The United States does not request authority from the Court to seize/take possession of the defendant property at this time and neither will the filing of the Verified Complaint for Forfeiture release the owner, Buffalo Creek Property Group LLC, of any obligation for payment of property, utility, or any other tax or service on the defendant property.   Buffalo Creek Property Group LLC will remain responsible for the upkeep, routine maintenance, and any demolition costs if demolition is warranted for the defendant property. The United States will, as provided by 18, USC §§ 985(b)(1)(2)and (c)(1):

(a)    post notice of this Complaint on the defendant property; and
(b)    serve notice of this action on the defendant property owner along with a copy of this Complaint; and
(c)    execute a Writ of Entry for the purpose of conducting an inspection and

inventory of the property; and

(d)     file a Notice of Lis Pendens in county records of the defendant property's status as a defendant in this <u>in</u> <u>rem</u> forfeiture action.

45.    Title 18 U.S.C. § 985(c)(3) provides that, because the United States will post notice of this Complaint on the defendant real property; it is not necessary for the Court to issue an arrest warrant <u>in</u> <u>rem</u>, or to take any other action to establish <u>in</u> <u>rem</u> jurisdiction over the defendant real property.   Title 18 U.S.C. § 985(b)(2) clearly states that the filing of a lis pendens and the execution of a writ of entry for the purpose of conducting an inspection and inventory of the property shall not be considered a seizure under this subsection.

46.    Therefore, the United States respectfully requests, under 18 U.S.C. § 985(b)(2), and under 18 U.S.C. § 983(j), which permits the Court to "take any other action to...preserve the availability of the property subject to civil forfeiture", that the Court issue the government's proposed Writ of Entry authorizing the United States Marshals Service or its designee, to enter the defendant real property, including any structures, on one or more occasions during the pendency of this <u>in</u> <u>rem</u> forfeiture action:

(a)     for the purpose of conducting an inspection and inventory and appraisal of the defendant real property, which inspection and inventory and appraisal may include still and video photography; and

(b)     to be accompanied on such occasion by any appraisers selected by it to appraise the condition and value of the defendant real property pursuant to 19 USC § 1606; and

(c)     to be accompanied on any such occasion by any government or contract personnel selected by it for the purpose of conducting an inventory of the defendant real property; and

(d)     to be accompanied on any such occasion by any federal, state, and local law enforcement officers selected by it to ensure the safety of any person acting under the Writ of Entry.

WHEREFORE, the plaintiff requests the following relief:

(1)    That a Notice of Complaint for Forfeiture Against Real Property be issued for the defendant real property;

(2)    That the Court issue a Writ of Entry authorizing the United States Marshals Service or its designee, to enter the defendant real property, including any structures, on one or more occasions during the pendency of this in rem forfeiture action;

(3)    That notice of this action be given to all persons known or thought to have an interest in or right against the defendant property;

(4)    That a judgment be entered declaring the defendant real property condemned and forfeited to the United States of America for disposition in accordance with the law;

(5)    That the plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this court deems proper and just.

DATED:      Buffalo, New York,   June 15, 2015.

WILLIAM J. HOCHUL, JR.
United States Attorney

BY:      s/RICHARD D. KAUFMAN
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5871
Richard.kaufman@usdoj.gov

# SCHEDULE A

## SCHEDULE A - DESCRIPTION

PARCEL A:

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, bounded and described as follows:

BEGINNING at a point in the dock line of the Buffalo River distant 155 feet southerly as measured along said dock line from its intersection with the easterly extension of the southerly wall of the Ganson Street Freight House of Erie Railroad Company, said point being the northeasterly corner of the land and premises conveyed by deed dated May 4, 1950 from Erie Railroad Company to The Federal Portland Cement Co., Inc. recorded in Liber 4724 of Deeds at page 124 of Erie County Deed Records;

(1)     THENCE westerly along a line drawn at right angles to said dock line of Buffalo River and along the northerly line of land conveyed as aforesaid by deed dated May 4, 1950 and its westerly extension 155.24 feet to a point distant 30 feet westerly measured at right angles to the southerly extension of the westerly wall of said Freight House;

(2)     THENCE northerly making an interior angle of 93° 47' with the preceding course parallel with the westerly wall of said Freight House and its southerly extension and distant 30 feet westerly therefrom, 531.50 feet to an angle point;

(3)     THENCE northwesterly continuing parallel to said westerly wall of said Freight House and distant 30 feet westerly therefrom and making an interior angle of 197° 20' with the preceding course, 91.78 feet to an iron pipe;

(4)     THENCE southwesterly at right angles 9.27 feet to an iron pipe in the division line between land of Erie Railroad Company on the east and lands of American Ship Building Company on the west;

(5)     THENCE northwesterly at right angles and along said last mentioned division line, 135.12 feet to a corner;

(6)     THENCE northeasterly along the division line between land of Erie Railroad Company on the south and lands of American Ship Building Company on the north and making an interior angle of 110° 37' 18" with the preceding course, 70.46 feet to an angle point therein;

(7)     THENCE northeasterly continuing along said last mentioned division line making an interior angle of 158° 37' 54" with the preceding course, 110.60 feet to said dock line of the Buffalo River;

(8)     THENCE southeasterly along said dock line 270 feet more or less to an angle point therein;

(9)     THENCE southerly continuing along said dock line, 415 feet more or less to a point of intersection with the easterly extension of the southerly wall of said Freight House;

(10)    THENCE southerly continuing along said dock line 155 feet to the point or place of beginning.

TOGETHER with the building and appurtenances thereon and together with the easement or right to use in common with the Erie Railroad Co., its successors, assigns, lessees, licensees and invitees for the purpose of ingress and egress to the aforedescribed premises, the present driveway and crossing, approximately 20 feet in width, the center line of which at its connection with Ganson Street is located at a point approximately 315 feet southerly as measured along the easterly line of Ganson Street from its intersection with the south line of Outer Lot 48, said driveway running easterly from Ganson Street to the westerly line of premises conveyed to The Federal Portland Cement Co., Inc. by Erie Railroad Company by deed dated May 4, 1950 and thence northerly along said westerly line to the aforedescribed premises, provided however, that the right is expressly reserved to Erie Railroad Company, its successor and assigns, to change the location of said driveway and crossing at any time, and from time to time, subject to the condition that Davego, Inc., its successors and assigns, shall always have access to the premises hereinbefore described from Ganson Street.

**PARCEL B:**

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York being part of Outer Lot Nos. 46, 47 and 48, described as follows:

BEGINNING at a point in the easterly line of Ganson Street, 605.07 feet southerly of the intersection of the east line of Ganson Street with the north line of Outer Lot No. 46;

THENCE southerly along said easterly line of Ganson Street south 16° 29' east a distance of 444.59 feet to an angle in said street line;

THENCE south 18° 57' east and continuing along the easterly line of said street for a distance of 407.71 feet more or less to the northwest corner of land conveyed to Francis J. Downing Construction Corporation by deed recorded in Liber 7200 of Deeds at page 69;

THENCE easterly at right angles along the north line of land so conveyed 221.29 feet;

THENCE northeasterly along a line deflecting 14° 29' 33" to the north from a prolongation of the last described course 159.1 feet;

THENCE north 13° 53' west for a distance of 135 feet to a point;

THENCE north 56° 44' east for a distance of 70.6 feet to a point;

THENCE north 77° 19' east along the northerly end of the Erie Railroad Company's freight house for a distance of 108.7 feet to a point in the southwesterly bounds of the Buffalo River, said point being 8.7 feet north, 77° 19' east from the northeasterly corner of said Erie Railroad Company's freight house;

THENCE northeasterly along the southwesterly bounds of the Buffalo River 810.93 feet more or less to a point in the northerly line of lands conveyed to Cooperative GLF Holding Corporation by a deed recorded in Liber 4074 of Deeds at page 90;

THENCE westerly parallel with the north line of Outer Lot No. 46 and along the north line of lands conveyed to Cooperative GLF Holding Corporation by deed aforesaid, 328.67 feet to a point in an easterly line of lands conveyed to the John W. Cowper Company, Inc. by a deed recorded in Liber 8717 of Deeds at page 321;

THENCE southerly along a line drawn at right angles with the last described line a distance of 148.67 feet;

THENCE westerly along a line drawn at an exterior angle of 90° 13' 08" with the last described line a distance of 249.55 feet to the point or place of beginning.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

         -v-

201 GANSON STREET,
BUFFALO, NEW YORK,

        Defendant.

_____

STATE OF NEW YORK  )
COUNTY OF ERIE      ) ss:
CITY OF BUFFALO   )

        Thomas Michalski, being duly sworn, deposes and says:

        I am a Special Agent with the Department of Labor in the Buffalo Office and I am one of the Investigators assigned to the forfeiture case against 201 GANSON Street, Buffalo, New York.   The facts alleged in the Complaint for Forfeiture are true to the best of my knowledge and belief based upon the investigation and information officially furnished to me by the United States Department of Transportation and provided to the United States Attorney's Office.

                               s/Thomas Michalski
                               Special Agent
                               Department of Labor

Sworn to before
me this 12th day of June, 2015.

s/Patricia L Young
   Notary Public

   PATRICIA L YOUNG
   Notary Public, State of New York
   Qualified in Niagara County
   My Commission Expires: 11-13-2017